**Oland ROBERTSON, Appellant,**

v.

**The RIG–A–LITE COMPANY, Inc., a Corporation, Appellee.**

No. 14577.

Court of Civil Appeals of Texas.

Houston.

Sept. 23, 1965.

Rehearing Denied Oct. 28, 1965.

Joseph D. Jamail, John Gano, Houston, for appellant.

The Kempers, W. L. Kemper, Sr., Houston, for appellee Rig-A-Lite Co., Inc.;

Mark Martin and Royal H. Brin, Jr., Dallas, and David Bland, Houston (Strasburger, Price, Kelton, Miller & Martin, Dallas, and Barrow, Bland, Rehmet & Singleton, Houston, of counsel), on rehearing.

Finis E. Cowan, Houston (Baker, Botts, Shepherd & Coates, Houston, of counsel), for Oil Production Maintenance, Inc.

COLEMAN, Justice.

This is a suit for damages by reason of personal injuries sustained by appellant when an oil well perforating gun, which he was rigging up at a well site, exploded. Appellant was an employee of McCullough Tool Company. Oil Production Maintenance Co., Inc., also referred to as O. P. M., was the owner of the drilling rig. In answer to special issues the jury found that the sole proximate cause of the explosion was the negligent failure of the defendant to insulate a junction box, a part of the electrical system in use at the rig, in the manufacture and assembly thereof. The answers to all other issues submitted were consistent with a judgment for appellant. The jury found damage in a sum in excess of $500,000.00.

The trial court rendered a judgment for the appellee notwithstanding the verdict. Appellee's motion alleged as grounds for such action that there was no evidence of probative force to justify the jury findings and that there were no facts introduced into evidence which would support any legal theory of recovery.

Appellant submits that the evidence fully supports the jury findings and that the facts found require the entry of a judgment in favor of the appellant. By cross-points appellee contends that the answers made by the jury are so contrary to the weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

In support of the judgment of the trial court appellee contends that there was no evidence that in the process of manufacturing and assembling the junction box installed at a position under the floor of Rig U–15 it negligently failed to insulate the box. A junction box, which was introduced into evidence, is a box 3″ in width and 9″ in length constructed of heavy aluminum open on two sides and with holes at both ends. The box is designed for plates of the same material to be attached to the open sides over water-tight gaskets by six screws. On each of the plates are two openings in which are fitted female electrical outlets, protected by metal covers attached to the plate by chains. When the covers are removed four appliances or extension cords can be plugged into the junction box. An insulated cable carrying two lines, one negative and the other positive, composed of many copper wires, enters the junction box at one of the holes in the end of the box. The two lines continue through the box and exit at the other end into a similar cable. Inside the box a smaller line is spliced into each of these lines to supply current to the outlets. The splice is soldered to secure stability and then is insulated with rubber or plastic tape over which is applied friction tape. The holes through which the cables enter and exit from the box are protected by hollow metal bolts and rubber gaskets. The cables are short and one terminates in a female plug, the other terminating in a male plug, both protected by heavy metal covers fitted with gaskets. These short cables are known as "pig-tails" and the length may vary on different junction boxes. Metal clamps attached to the box by screws are provided as a means of fastening the box to a rig member.

Within one or two days after the explosion in which appellant was injured, a witness, sent by appellant's employer to investigate certain aspects of the electrical system, and who qualified as an electrical expert, by the use of a megohmmeter, found that a junction box located at position A, which was under the floor of Rig U–15, had an insulation resistance reading practically of zero and that another box had a reading of 800,000 ohms, indicating no re-

sistance at Box A and less resistance than was proper at the other box. As a result of his tests he determined that no circuit other than the one going under the derrick floor showed low resistance. Other circuits went up the derrick and to the light near the end of the catwalk. He then removed a plate from the box at position A under the floor and found dampness and droplets of water inside the box. He also found that both the rubber tape and the friction tape were loosely and inexpertly applied around the splice. He testified that the tape should be applied tightly and that successive layers should overlap and bond securely to the previous one and that this was not so applied. The tape would not stretch and there was no indication of deterioration, or that the box had in any manner been altered or that any work had been done on it. It was his opinion that the loose tape on the splice, in connection with the moisture in the box, charged the derrick members with an electric potential of 115 volts, which would do no damage until the electrical path from Box A was completed back to the other conductor to the light plant source. He testified that Junction Box "A" was bolted to a rig member, and that it was energized because of the defective insulation and that all metal members of the rig connected with it would become conductors. However, he testified that a person touching any of the rig members would receive no electrical charge unless he completed a path to the other conductor. He gave his professional opinion that some or all of the members of the derrick were electrically charged from one side of the circuit, and that if the insulation in Junction Box "A" had been what it should have been, the derrick members would not have been electrically charged. He testified that when he made his investigation the derrick had been moved from the location at which the explosion had taken place, but that the derrick and its equipment were set up just as before.

Other testimony shows that the electrical system was specially designed by appellee for Rig U–15 and that while the junction boxes were usually placed at the same position each time the rig was moved to a new location, this was not invariably true. While it appears that the electrical system is removed from the rig when it is dismantled for moving, it does not appear that the junction boxes are disconnected from the electric cables. While the junction boxes appear to be interchangeable, differing only in the number of outlets and, possibly, length of pig-tails, there is no evidence that either on this particular occasion, or as a general rule, after the rig was moved the boxes were replaced in the system at random, or moved from one circuit to a different circuit. There was testimony that the junction boxes go back basically in the same places.

Another person employed by the McCullough Tool Company investigated the accident before the rig was moved. He also qualified as an electrical expert. He checked the truck and equipment used in connection with the perforating gun, and found that all safety precautions had been taken and that all safety devises were in place, and testified that the explosion could not have been caused by electrical energy from the power source in the truck. He found that the gun had been hooked up to the long electric cable carried in the truck and attached to a power source in the truck. This was a cable so designed and of such length as to be capable of lowering the gun to the bottom of the oil well. Several safety features were shown to be present which were designed to prevent the passage of electrical energy through the line from the power source prematurely. There is no evidence that the explosion was caused by electricity from this source.

The gun itself is about ten feet long and, at the time of the explosion, had been placed in the metal lubricator in which it is lowered into the well. It is composed of a number of packets of a chemical powder, or charges, designed to be exploded with a blasting cap in the bottom, or "bull-nose,"

of the gun. The blasting cap is designed to be detonated by an electric charge.

In his investigation this witness located the point of the explosion on the derrick floor. He examined the gun and "found that the bottom part of the gun had some electrical arc exposed to it like from a welding torch or something of that nature, and upon further investigation it was found to have great electrical potential between the gun and a light fixture which showed to have enough voltage available to fire this gun." He also checked the length of the gun, the position of the gun, the point of the explosion, and the location of the light pole, which was a metal pole inserted in the ground. He checked the pole with a volt meter and found it to be charged with 115 volts DC. It was his opinion that the gun rolled over as appellant worked on it, touched the pole, and received a sufficient charge of electricity to cause the blasting cap to explode. In the course of his investigation he found voltage potentials between a number of places along the pipe rack, rig floor and catwalk, which could have caused the gun to fire, but it was his opinion that the electric potential in the light pole was the actual cause of the explosion. He testified that if one standing in the area of the light pole touched it, he would receive no shock, but that if, at the time he touched it, he was also touching the line to the perforating unit, the gun, or the lubricator lying on the catwalk, he would probably be killed. He testified that the electricity in the pole had to be the result of a short in one of the junction boxes in the power source line, but that he made no investigation to determine which box was defective. This witness further testified that he supervised a test made under the same conditions as were present at the time of the explosion, using the same type of Mack jet equipment and the same voltage and the same type of cap and "we have been able to fire this cap by setting up this potential."

Joe Willson was employed by Oil Production Maintenance, Inc. to work in their shop some time in 1947. For some years prior to 1960 he was shop foreman. He testified that he did not remember ever ordering any component parts for junction boxes from Rig-A-Lite and that he had never repaired a junction box prior to 1960, and that so far as he knew no one else assembled component parts of junction boxes in or around the Oil Production Maintenance shop, and that he did not think it possible that boxes were assembled by Oil Production Maintenance because of the shop set-up. No junction boxes were repaired under his instructions prior to 1960, and he knew of no one else working for O. P. M. who would have instructed anyone else to make such repairs. He testified that junction boxes were repaired by Rig-A-Lite, and that he knew of no one else who did any repairs at all on the junction boxes.

He testified that junction boxes were sent in for repair by employees on a rig on occasion in the company truck, and that he would send them to Rig-A-Lite, without making any inspection, with instructions to repair them. The only specific instruction he ever gave Rig-A-Lite concerned the length of the "pig-tail". The repaired junction box would then be sent to the next rig requesting a junction box. O. P. M. had seven rigs. He further testified that if the component parts were bought from Rig-A-Lite the wiring would be done and the receptacles taped by Rig-A-Lite. He further testified that prior to 1962 "we did not buy anything other than Rig-A-Lite. We bought all Rig-A-Lite boxes, strings and works up until that time."

Willson was shown several delivery receipts which he or other O. P. M. employees had signed and testified that based on the information contained there it was probable that someone had repaired boxes since the items shown on the receipts were parts of junction boxes, but that they were not repaired in the shop. He did not know whether mechanics at the rig repaired boxes, but this might have been the practice before he came to O. P. M.

There was other testimony to the effect that the employees on the rigs made no checks or inspections of the interior of the junction boxes and that the only way they knew when one was defective was when the lights would go off. There was testimony from a Rig-A-Lite employee who worked at assembling the junction boxes that they were water-proof if the protective covers provided for the sockets were in place. He testified that the plugs provided for use in the sockets were also equipped with protective metal covers which made the box water-proof when in use. He testified that when they made the splice on the main lines, they were made real tight so there would be no vibration and that they then taped it tight. He testified that if it wasn't taped tightly and water got on the splice it would probably burn the wire in two or cause a short, and that if it shorted out the electricity would be uncontrolled, and a dangerous situation created.

Lemmons, a witness called by Rig-A-Lite, had worked on Rig U–15 since 1957. He testified that the electrical equipment, including the "insides" of junction boxes, deteriorated pretty frequently, particularly in wet weather, and that his attention would normally be called to a bad junction box by reason of the lights going out or dimming. He testified that when junction boxes burned out, they would be replaced by repaired ones, and the burned out box would be sent to the company yard "and they would repair it." When the rig was moved most of the electrical cable and equipment was left attached to the derrick except that in the top of the derrick and the line going out the catwalk, and to the light pole. When the derrick was erected at a new location the lighting system, wires and boxes were placed as nearly in the same position as the men could place them. He testified that caps would be missing from some of the junction boxes and that sometimes the caps were not replaced after the box was in use, and that this happened once or twice a week. When he saw a box with the cap off, he would screw it on. He tes-

tified that he had repaired the inside of a junction box by rewiring and taping it after the accident, but not before, and that he had seen boxes repaired in the company yard, but not before 1962. He also testified that after the accident while standing on the ground he had touched the light pole, but had not been shocked. The last time he remembered replacing a junction box on that rig was about three months before the accident. He testified that there was no occasion to look inside a junction box at the rig. He testified that there was no way to look at one of the boxes and tell how old it was or when it was delivered to the rig. He testified that so far as he knew prior to the accident there was nothing wrong with the wiring or electrical system of the rig and that he had noticed no defects during the three or four weeks before the accident.

The witness Wyatt, called by Rig-A-Lite, started working for O. P. M. as a tool pusher. In 1947 he was made drilling superintendent in charge of all rigs. Rig U–15 was acquired in 1947, and he remained drilling superintendent in supervisory charge of Rig U–15 from that date to and including the date of the accident in 1960. He was not able to testify whether any one junction box with which the rig was equipped in 1947 was still in use without having been repaired in 1960, but based on his general knowledge of and experience with lighting equipment, he did not think it probable that any one of the original boxes would have been on Rig U–15 on May 23, 1960, without having been repaired. He had never seen a junction box repaired at the rig, or at the O. P. M. shop. He testified that the men are instructed to take particular care of the light wires and junction boxes and he believed that they did, but occasionally caps were left off the junction boxes when no plugs were in the receptacles, as on any oil rig. He testified that diesel oil, drilling mud containing chemicals and water were used around the rig and practically all drilling rigs; that there was considerable vibration around

all drilling rigs; and that electrical equipment did deteriorate. He testified that all lighting equipment was purchased from Rig-A-Lite and that junction boxes should last for a period of years; that when they bought a new junction box they would no more take it apart to check it than they would a new electric drill. He testified that he was reasonably sure other junction boxes were put on the rig and that he thought they would be new boxes. It was his testimony that Willson handled the repair of junction boxes and that the general procedure was to send them to Rig-A-Lite, who would make whatever repairs were needed and then send O. P. M. an itemized bill for parts and labor.

He testified that perforating guns are used on all oil wells except dry holes and that because of the danger presented by the use of explosives and inflammable materials around oil rigs specialized equipment designed to minimize the risks was purchased and used. He testified that the crew of the U–15 were as careful with the electrical equipment, particularly in regard to replacing caps on the junction boxes, as ordinary roughnecks working in the oilfield normally are.

Smith, an employee of O. P. M., was called to the stand by Rig-A-Lite and testified that during drilling mud would come out of the drill pipe and flow over on the floor and that this mud would be washed off with a water hose. This water would get on some of the junction boxes and if the caps were off, as they sometimes were, while the water could not flow into the boxes, it would get damp inside them. When a junction box went out, he would take it loose where it was spliced into the main cable and send it to the shop. He testified that there was no way of telling whether the boxes were new or old. He said that the electrical system on U–15, so far as he knew from working on it, was in perfect condition and that it was kept in that condition. He had worked on U–15 for two years prior to the accident and he had never repaired a junction box at the

rig. He was in charge of maintaining the electrical system at the time of the accident. He had worked on other rigs and for other companies and it was his opinion that the men on U–15 put the caps on the boxes as quickly and as carefully as they could under the circumstances existing in the oil fields.

Mr. Sands, a safety engineer for O. P. M. at the time of the accident, testified that after the accident he procured the junction box pointed out to him as being the one taken from the light pole. He found that the interior of this box was in "surprisingly" good shape and saw nothing to indicate that it was defective, but he found shrapnel-like pieces of metal which pierced the rubber sheath covering the conductor wiring and appeared to be imbedded in the wiring itself. There were a number of pieces of this shrapnel, which could have formed an electrical path from the inside of the cable to any metal it might have touched on the outside. It might be noted that the Mack jet gun perforated oil well casing with hot gases rather than bullets.

Oland Robertson, appellant, testified that he had little formal education and had always supported himself and his family by manual labor. At the time of the accident he had a steady job with McCullough Tool Company in the capacity of rigger and operator. He described the perforating unit and gun with which he was working at the time of the accident, detailing the safety devises with which it was equipped and the safety precautions which he took. Among other precautions he grounded the truck to the rig and grounded the collar locator, which was attached to the cable from the truck, and to which the gun was attached. The wire cable was suspended from the derrick by means of "shivs" and was scattered all over the derrick floor. He testified that no one hit or bumped the gun and that it would withstand a certain amount of rough handling since it was delivered to the rig over rough roads in the back of a pick-up truck, and necessarily bumped the sides of the cas-

ing when it was lowered into the well. He had never known of a Mack jet gun being detonated by any means other than an electric charge. Immediately before the accident he was on his knees on the catwalk putting the pack-off in the lubricator when he heard a "sizz", looked up and saw sparks and the explosion occurred immediately. He does not think that the gun hit the light pole, but that it did contact a metal member of the catwalk or pipe rack. One of his knees was on the wood floor, the other on an iron railing. The lubricator and gun were lying flat on the floor. He was pushing a rubber into the pack-off head at the time of the explosion. The bottom of the gun, at which point the fuse or "bull-nose", is exposed, was pointed in the general direction of the light pole. He could not remember whether the gun slipped or rolled, and did not know whether it touched the light pole.

The testimony of Edwin F. Osborne, Jr., the President of Rig-A-Lite, Inc., was presented at the trial. In summary, he testified that the junction boxes sold by his company were essentially just like they were the first time he saw them. He began his employment with the company in 1955. No single component of the box was actually manufactured by Rig-A-Lite. The company procures from different sources the cast aluminum housing, covers, nuts, rubber grommets, receptacles, lead wire, splicers and tape and from these materials assembles the finished product. The gaskets and gasketed covers are used to keep the boxes dry inside because water is an excellent conductor of electricity. The splices inside the junction box are wrapped with tape designed to insulate against moisture. He knew that uncontrolled electricity is dangerous and that if the Rig-A-Lite equipment should be defective it might permit electricity to escape from its designed channels. Most of the equipment sold is designed for specific drilling rigs. He knew that at the site of old field drilling operations explosives and explosive materials are often kept and used. The compa-

ny had no specific procedure for safety checks for the equipment manufactured. He knew that perforating guns were used on oil wells, but did not know how they operated. An employee of the company applied the insulating material to the splice and he was supposed to test each item for proper and safe operation. The foreman was supposed to check to see that the system worked and there were no obvious shorts that would burn out the system. He knew that the lighting systems on oil rigs had to be special equipment because of possible exposure to all types of inflammable materials and highly explosive situations. The company advertised the equipment as being vapor-tight, explosive-proof and water-tight.

There is testimony that replacement junction boxes on Rig U–15 were installed by the motor man, who was not necessarily or customarily an electrician. This employee would splice the pig-tails into the wires in the system's cable and then apply a protective wrapping of tape. There was also testimony that tape, after exposure to the weather, chemicals used in the drilling mud, and water used to wash off the platform, would deteriorate and sometimes become loose.

Appellee produced the testimony of Mr. Scott, a mechanical engineer, and of Mr. Berman, an electrical engineer, hired by it to advise its attorneys on the technical aspects of the case and to conduct certain investigations and tests. The testimony showed them to be well qualified as experts in the field of electricity. Their testimony generally supported the proposition that the evidence failed to show the manner in which, assuming an electrical potential in the derrick members, the circuit was completed, in which event the defective box could not have been a cause in fact of the explosion. There was also testimony that the electrical energy from the derrick, assuming a closed circuit, would not explode the gun unless it energized the cable which was designed to convey an electrical charge to the gun and that since the inner wire of

this cable was insulated from the outer wire, that circuit would not be completed by a charge applied to the cable or the gun and no explosion would result. Tests were conducted with a similar cable and an attached fuse which, it was testified, corroborated this testimony. Scott testified that the gun could be set off by a sudden blow of considerable force; by a transmitting radio at the rig, or microwave radio stations, or by galvanic action, a chemical reaction between the gun, the drilling mud, and the pipe, but it would require a leak in the insulation to establish a circuit, or from a lightning flash even at a distance of several miles. He testified that the outer steel cable used to lower the gun into the well was a good conductor of electricity and if the cable was draped around the rig, there were many ways a circuit could be completed in the outer armor, but it was his opinion that unless there was a defect in the insulation of the cable that would permit the involvement of the wire inside the cable thereby energizing the firing circuit, no explosion would occur. He could not testify that there was any lightning on the occasion in question or that galvanic action did combine with a leak in the insulation of the line to the gun. It might have been exploded by an induced current from a parallel conductor carrying a high frequency current. It was Mr. Scott's testimony that an outside source of electricity could not involve the firing circuit unless the inner wire of the gun cable was defectively insulated, and that such an outside source of electric power could not detonate the gun unless it activated the firing circuit. He then performed an experiment with a flash bulb that illustrated his testimony. Using a 130 volt battery, he caused an arc to be formed in the outside circuit of an armored cable, to which a flash bulb was wired by arcing on the lead of the bulb and the bulb did not light. Then by activating the circuit to which the bulb was attached the bulb lighted and burned out. He testified that the conditions of the experiment were electrically the same as on the occasion of the accident. He testified that radio fre-

quency and the energy generated by induction would energize the firing circuit without there being a defect in the insulation of the inner wire in the cable. He could not testify that the impact force of the gun rolling against the light pole would cause it to explode without knowing the impact force, and without knowing the qualities of the explosives contained in the cap. Similarly, without knowing the amount of electrical energy caused by radio present at the time of the explosion, he could not testify that radio had anything to do with the explosion. Mr. Berman testified generally to the effect that it was his opinion that the junction box had nothing to do with the explosion since he did not know how a circuit was completed.

We must consider the evidence in the light most favorable to the verdict, disregarding all conflicts in the evidence, and indulging every intendment and inference reasonably deducible from the evidence in favor of the verdict of the jury. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194; Le Master v. Fort Worth Transit Company, 138 Tex. 512, 160 S.W.2d 224; McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442.

There is evidence that junction box "A" contained defectively insulated wiring and that as a result of this defect, and an accumulation of moisture inside the box, rig members were energized. There is expert opinion testimony that if the cable to the perforating gun was draped around the rig, there were many ways the circuit could be completed. The testimony is undisputed that the cable was draped around the rig. There was other expert opinion testimony that the defectively insulated box caused the rig members to be energized; that a circuit was completed resulting in an electrical arc on the fuse of the gun causing the explosion. There was testimony that an experiment on the same type gun under the same conditions resulted in an explosion. Appellant testified to a "sizz" noise and to seeing sparks before the explosion.

There was testimony that there was evidence of arcing on the metal covering of the cap.

■ Special Issue No. 1, on which liability must be predicated, reads: "Do you find from a preponderance of the evidence that the Defendant, Rig-A-Lite, Inc., *in manufacturing and assembling the junction box* installed at position A on the Rig U-15 failed to insulate said box * * *." (emphasis added)

The evidence is undisputed that it is not probable that any of the junction boxes purchased as part of the original lighting system were in use at the time of the accident unless they had been repaired. There is evidence that all repairs were made by Rig-A-Lite, Inc., but the issue does not inquire about a repaired box, but about a box *manufactured* and *assembled* by appellee. The evidence shows that the wiring requiring insulation was manufactured, assembled and insulated by appellee and that the insulation in this particular box was defective. The inquiry appears to be directed to the time when the *box* was manufactured and assembled.

The question, then, is whether there is evidence from which an inference can be drawn that the defectively insulated wiring was present in the box when it was originally purchased in view of the testimony that the original boxes had probably been repaired; the testimony that boxes were sent to Rig-A-Lite for repair; and that replacement parts suitable for repairs were purchased by O. P. M. There is no direct testimony from which it can be determined when any specific box used on Rig U-15 the night of the accident was purchased or that any specific box had been repaired or had been replaced by a new box.

There is evidence that the tape used for insulation on the box at position A showed no signs of deterioration and that the box showed no signs of having been altered or of having had any work done on it. There is evidence that electrical equipment will deteriorate; that the "insides" of the boxes deteriorated pretty frequently, particularly in wet weather, and that the tape deteriorates first. There was testimony that the vibrations typical of the operation of a drilling rig cause nuts, bolts and screws to become loose, necessitating frequent tightening. An inference could be drawn from this testimony that the box in question was a new box rather than a repaired box. There is evidence that on November 24, 1959, about five months before the accident, a two-hole box was purchased from Rig-A-Lite, Inc. by O. P. M. for Rig U-15. There is evidence that a junction box was replaced on Rig U-15 about three months before the accident. The evidence does not show how many "holes" or receptacles the box in question contained and does not eliminate the possibility that it was a two-hole box. We find, therefore, that there was some evidence of probative value requiring the submission of Special Issue No. 1 to the jury.

■ Without again setting out the evidence we find it sufficient to require the submission of Special Issue No. 2 concerning proximate cause, and Special Issue No. 9, the damage issue. The trial court erred in rendering a judgment notwithstanding the verdict since a directed verdict would not have been authorized under the facts. Hicks v. Matthews, 153 Tex. 177, 266 S.W.2d 846.

■ Appellee urges that it could not reasonably have foreseen any injury to appellant in which event there would be no evidence to support a finding of proximate cause. The injury was of such a general character are might reasonably have been anticipated, and the injured party was so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen. This test for proximate causation was approved in Carey v. Pure Distributing Corp., 133 Tex. 31, 124 S.W.2d 847.

In International Derrick & Equipment Co. v. Croix, 241 F.2d 216, the United States

Court of Appeals, Fifth Circuit, held that Texas follows the rule set forth in Restatement, Torts, § 395, as follows:

"'A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured.'"

It is obvious from the record that appellant was attempting to predicate liability on this theory of the law and we have held that sufficient evidence was presented to require submission of the case to the jury. We cannot sustain the judgment of the trial court on the theory presented by appellee's second Counterpoint.

■ In addition, appellant plead:

"The wiring and lighting fixtures, and junction boxes manufactured and furnished by the Defendant had been installed upon metal pipe and by reason of defective insulation of the wiring or lighting fixtures, or junction boxes the gun prematurely discharged. * * *

"The injuries and damages suffered by your Plaintiff which were proximately caused by the negligence of the Defendant, * * * in manufacturing and furnishing defective and poorly insulated wiring, lighting fixtures and junction boxes * * * caused him physical pain and mental anguish. * * *"

This pleading was sufficient basis for the submission of issues to the jury based on the evidence that all of the spliced wiring used in the junction boxes, whether sold as a unit installed in a box, or for installation in a box in making repairs, was manufactured by appellee complete with insulation and that the wiring found in the box in question was improperly insulated.

■ While issues based on this evidence were not requested or submitted by the court, the pleadings and evidence raised issues which a jury might have found in favor of appellant under the evidence to constitute a basis for holding appellee liable in damages. On such a state of facts a judgment non obstante veredicto is not proper even though the only ground of liability presented to the jury was supported by no evidence. Hicks v. Matthews, 153 Tex. 177, 266 S.W.2d 846.

By crosspoints appellee asserts that the answer made by the jury to Special Issue No. 1 is contrary to the great weight and preponderance of the evidence and that the answer made to Special Issue No. 9 is so contrary to the great weight and preponderance of the evidence "as to be manifestly unjust and clearly wrong in the excessiveness thereof."

■ The exact number of junction boxes on Rig U–15 was not established, but it appears that there were six or more. O. P. M. owned seven rigs, all of which were equipped with these boxes. The evidence shows that repaired boxes were not returned to the rig from which they were taken as a rule. There is evidence from which the jury might well have concluded that repaired boxes were in use on Rig U–15. There is no testimony that the specific box located at position A had been repaired either by O. P. M. or Rig-A-Lite, Inc. In this state of the evidence, we are not prepared to hold that the answer made by the jury to Special Issue No. 1 is so contrary to the great weight and preponderance of the evidence as to be clearly wrong.

■ The evidence shows that appellant lost both hands and one leg below the knee as a result of his injuries. He never lost consciousness. A long period of time elapsed before he received medical atten-

tion. It is obvious that he suffered great pain and mental anguish. He testified to phantom pain in his missing members. The jury could consider his disfigurement as an element of mental anguish. He was 31 years of age, with a life expectancy approaching 36 years. He had little formal education. He was married and had small children. He testified that he was not proficient in the use of his wooden leg and often fell, and was not able to engage in his accustomed recreational activities. He was not proficient in the use of the metal appliances fitted to his arms and could not care for all his own personal needs. His employer made a job for him answering a telephone, continued his salary, including him in a general raise in pay, but his future employment was not guaranteed. He was earning approximately $6,000.00 yearly before the accident. The jury could properly award a large amount for loss of earning capacity. The amount of an award for mental anguish and physical pain and suffering is largely left to the discretion of the jury. We cannot say that the answer of the jury to the damage issue is so contrary to the great weight and preponderance of the evidence as to require the granting of a new trial. The testimony concerning damages was not presented, so far as the record reflects, in a dramatic or inflammatory manner, and we find nothing in the record to indicate that the jury disregarded the evidence and based their answer on prejudice, passion or sympathy. Usually a verdict which is excessive can be cured by requiring a remittitur. The issue of the excessiveness of the award is not raised by the point of error, and we express no opinion on that issue. Collins v. Smith, 142 Tex. 36, 175 S.W.2d 407.

The jury found no other act of negligence, either on the part of appellant or of any third party. We find nothing established by the record as a proximate cause of the accident other than the issue on which appellee's liability is predicated. The answer made to Special Issue No. 3 concerning sole proximate cause is supported by evidence and is not contrary to the great weight and preponderance of the evidence.

Appellee has stated in its brief that in the event this cause is reversed, it desires to have the cause remanded to the trial court in order that it might have the opportunity to present a motion for new trial setting up jury misconduct. This procedure is required by Rule 324, Texas Rules of Civil Procedure. Farias v. Gaitan, Tex.Civ.App., 312 S.W.2d 273, error ref., n. r. e.

The judgment is reversed and the cause remanded with instructions that the Court enter judgment for the plaintiff on the jury's verdict, and for further proceedings in accordance with Rule 324, T.R.C.P., as amended September 1, 1957.

Reversed and remanded with instructions.