Manuel P. FREITAS et al., Appellants,

v.

TWIN CITY FISHERMAN'S COOPERA-
TIVE ASSOCIATION et al., Appellees.

No. 4705.

Court of Civil Appeals of Texas.

Waco.

June 27, 1968.

Joseph D. Jamail, Houston, and Warren Burnett, Odessa, for appellants.

Rentfro & Rentfro, Brownsville, John Stayton McGinnis, Lochridge, Kilgore, Bufield, Hunter & Wilson, Austin, John E. Lewis, Adams, Graham, Lewis & Graham, Harlingen, Wiech, Lewis & Pipkin, Brownsville, Bascom Cox, Cox, Wilson, Duncan & Clendenin, Brownsville, for appellees.

## OPINION

TIREY, Justice.

This is a negligence case. Plaintiff Freitas brought the action against Twin City Fisherman's Cooperative Association and the Gulf Oil Corporation and alleged that each of the appellees breached a warranty and further that they were guilty of negligence concerning a ladder, walkway and platform on appellees' premises and fuel tank, and that such negligence proximately resulted in serious injuries and damages to him. The Aetna Casualty & Surety Company intervened against appellees for workman's compensation benefits that it had previously paid to Freitas. These matters were stipulated. The Gulf Oil Corporation sued Twin City Fisherman's Cooperative for indemnity and Twin City Fisherman's Cooperative Association responded with a cross-action against Gulf Oil Corporation for indemnity or contribution. At the close of all the evidence the court instructed the jury to return a verdict for the defendants and against plaintiffs and accordingly entered judgment for the defendants and against plaintiffs, and the plaintiffs and intervenor have perfected their appeal to the Corpus Christi Court and the cause is here on transfer.

The judgment is assailed on 9 points.

Points 1 through 5 complain substantially that the court erred in withdrawing the case from the jury and instructing the jury that plaintiff, Freitas, take nothing against Twin City Fisherman's Cooperative Association and Gulf Oil Corporation. We sustain these contentions and reverse the cause for reasons hereinafter noted.

■ In passing upon the foregoing points we are bound by the Rule announced by this court in Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511 (w. ref.). We must consider the whole of the testimony in the light of all the surrounding facts and circumstances, and in so doing the Rule as to an instructed verdict is:

"Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" Citing many cases.

■ The Supreme Court has never changed or modified the foregoing Rule. At the same time we must bear in mind our Supreme Court has said that the duty or care owed by a landowner or occupier to an invitee is to keep his premises in a reasonably safe condition for invitees. This includes the duty to use reasonable care to inspect the premises to discover dangerous conditions and to warn of dangers that are not open and obvious. See Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Sup.Ct.); Genell, Inc. v. Flynn, 163 Tex. 632, 358 S.W.2d 543 and Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425. It is also our duty to keep in mind that with reference to invitees such owners are not the insurer of the safe condition of their premises, and that mere injury to an invitee on the premises is not of itself enough to allow the invitee to recover from the landowner. It must be shown in some way that the landowner breached his duty of care to the invitee. Fort Worth & D. C. Ry. Co. v. Hambright, Tex.Civ.App., 130 S.W.2d 436 (wr. ref.) judgment correct. Scheps v. La Rose, Tex.Civ.App., 88 S.W.2d 557 (n. w. h.). See also Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374.

■ Going back to the testimony, it is our duty to consider the evidence in the light most favorable to the plaintiff, disregarding all conflicts in the evidence and

indulging every intendment and inference reasonably deducible from the evidence in favor of the plaintiff and against the instructed verdict and the judgment of the court. See White v. White, 141 Tex. 328, 172 S.W.2d 295; Air Conditioning, Inc. v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422; Kelly v. McKay, 149 Tex. 343, 233 S.W.2d 121. We think the effect of the foregoing cases cited is to hold that the controlling question here before us is whether there is any evidence in the record which would, if accepted by a jury, have raised an issue of fact which would have supported a judgment for the plaintiff.

 The evidence is to the effect that on the night of December 15, 1962, the plaintiff, who was an employee of Coastal Transport, Inc., was delivering fuel of the Gulf Oil Corporation to Twin City Fisherman's Cooperative Association, Inc., and while thus engaged as a business invitee upon the appellees' premises, sustained serious injuries when he encountered a dangerous and unsafe condition that was neither known to him nor open and obvious on the appellees' premises. The evidence is without dispute that plaintiff received his injuries while in the discharge of his duties, and while he was descending a ladder, which ladder was designed, manufactured and installed by the appellees for the use of the invitees engaged in the use of the storage tank. Evidence was tendered to the effect that the ladder leading from the platform on which the tank was constructed was unattached to the tank or ground, and that while the plaintiff was descending from the tank the ladder lurched to the right side, throwing plaintiff off and down to the ground; that the tank, platform and ladder were designed, manufactured and constructed and were being used at this particular place by Gulf and at its discretion on land owned and occupied by Twin City. The tank, platform and ladder were jointly used by Gulf and Twin City for the purpose of facilitating Gulf's sale,

delivery and storage of fuel to Twin City. The ladder, platform and tank were in the same condition without material change on the date of the injury as they were manufactured, designed and installed originally. The condition of the ladder was known to Twin. Gulf put the fuel so sold and delivered to Twin City into the bank. Twin City used the fuel it so bought and sold out of the tank. At the time plaintiff received his injury he was making this fuel delivery and he was the business invitee of both Gulf and Twin City, furthering both their business interest at the time of the injury. As we understand the rule the plaintiff was the one to whom Twin City, as well as Gulf, owed the duty of ordinary care to keep the premises where plaintiff was at the time of the injury in reasonably safe condition for his use and to warn him of the dangers that were not open and obvious, and that since the ladder was unattached to the tank or platform it might lurch or fall in plaintiff's use thereof. It is our view that appellees breached these duties to plaintiff's injury. Since Gulf Corporation designed, manufactured and assembled and supplied the tank, platform and ladder involved here on the night of December 15, 1962, it owed a duty to exercise ordinary care in the manufacture, design and supply of such facilities which Gulf should have recognized as involving an unreasonable risk of causing harm to those who used it for the purpose for which it was manufactured, and to those whom the suppliers with knowledge of its condition should expect to be in the vicinity of its reasonable and probable use. We think these duties were breached by Gulf and Twin City and resulted in plaintiff's injury under the doctrine announced in Robertson v. Rig-A-Lite Company, Inc., Tex.Civ.App., 394 S.W.2d 838; International Derrick and Equipment Co. v. Croix, Texas Emp. Ins. Ass'n, Intervenor, 5th Cir., 241 F.2d 216; Johnson v. Murray Co., Tex.Civ.App., 90 S.W.2d 920; Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99. We think the testimony

tendered under all the facts and surrounding circumstances was sufficient to raise the issue that the ladder and platform should have been designed and made by appellees, and particularly Gulf, in such way that it was attached or fastened to the tank itself or to the ground sufficiently that it would be firm in its ordinary and customary use, and also the use being made of it by plaintiff at the time he received his fall or injuries. We have carefully considered the opinion of the Court of Civil Appeals in Humble Oil & Refining Co. v. Whitten, 415 S.W.2d 287, and the opinion of the Supreme Court in the same cause reported in Vol. 11, No. 29, of the Supreme Court Journal dated April 20, 1968, 427 S.W.2d 313, and as we understand the opinion of the Supreme Court in this cause it is distinguished from the Rule in Ellis v. Moore, Tex., 401 S.W.2d 789, on the ground that there was a new and independent cause which supersedes Humble's act of negligence. Neither appellee should have permitted its continued existence and use in its movable and unattached condition to continue from the time of its installation and up to the time of plaintiff's injury. Since both appellees had invited plaintiff on the premises each was under a duty to remedy the condition and to warn him of the unattached condition of the ladder and platform and its threat of injury to him. Evidence was tendered to the effect that similar ladders in similar construction and use on such tanks are so anchored and attached as to render them firm, rigid and safe in their use. We think the failure of Gulf to so anchor the ladder and platform in this instance violates such customary or ordinary safeguards, and is some evidence of its failure to exercise ordinary care in the design and manufacture of the facility involved in this case. We think it is obvious that without such failure plaintiff's injury would not have occurred and it tenders the issue that the failure on the part of appellees so to do was a proximate cause of plaintiff's injury. We are of the further

view that the evidence tenders the issue that the unattached and movable condition of the ladder and platform was unsafe and dangerous to persons climbing the same, including plaintiff, using it for the purpose it was manufactured, designed and supplied. We think plaintiff had the right to assume that the premises, including this ladder and platform, were in reasonably safe condition for his use, and that it was not defective, unsafe, dangerous or negligently designed, made or maintained. Plaintiff was entitled to the exercise of at least ordinary care in his behalf by each of the appellees. We think the evidence tenders the issue that he did not get such care. We think we should say that we have given much consideration to the opinion of the Supreme Court in the Halepeska case and its opinions thereafter dealing with the "no duty" situations. We refer to Ellis v. Moore, Tex., 401 S.W.2d 789; Scott v. Liebman, Tex., 404 S.W.2d 288, and J. & W. Corporation v. Ball, Tex., 414 S.W.2d 143, and, as we understand our Supreme Court in each of these cases, we think the clearest statement of the majority opinion in each of these cases is found in the Ellis case, Point 1:

"This Court in Halepeska v. Callihan interests, Inc., * * * recognized that the assumed risk doctrine is a relatively harsh one, and the Court indicated that it felt required to keep it within justifiable limits. * * *. It was the clear holding of this Court in McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 * * * as well as in the Halepeska case that the knowledge of the defect is not enough. *There must be knowledge of the danger involved and the appreciation of the danger.* This Court pointed out in Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), *that there must be knowledge and appreciation of the particular danger involved so that the plaintiff proceeds to encounter the risk as the result of an intelligent choice.*" (Emphasis added.)

Plaintiff testified in part as follows:

"Q. * * * After you hooked up your line from your fuel truck to your tank, what did you then next do?

"A. Well, we have a power-take-off and we just put it in gear and it pumps the fuel off of our truck into this tank. And that's what I done. I started it pumping off. And it takes—oh, about—anywhere from 40 to 50 minutes to unload it, as normal route. And I had let it unload about 30–35 minutes, and I decided I would go up and check it again, make sure it would hold a load so I wouldn't run it over. Because company rules and regulations say that if we spill any fuel, pumping it over or unloading in a service station, and we pay for it. And so I went back up to the tank and looked inside of it to make sure that it would hold it. And when I started down I taken my flashlight and I put it in my pocket so that I could hold onto the handrail it had up there, and I had one foot on top of the platform and I had one foot on the—what's you call the—anyway, it was starting down the top rung on the ladder is what it is, and when I started down, well, I had one hand up high and then one low, you know, just like you start go down regular ladder, how you hold on to come down it, and when I started down it, well, it give a jerk or just lurched to the right and I heard something I didn't know what it was, and felt something odd, and just as it lurched, and it threw me off then. I couldn't hold on. I tried to re-grab again and I just couldn't hold on. And when I reached—when it threw me, well, I reached with my left hand and when I did, well, it done something to my thumb and I couldn't re-catch my hold. I went on and hit the ground then.

"Q. Did you feel or did you notice—when you say this lurch, what—describe that for me a little bit.

"A. Well, it's—

"Q. Or this jerk as you put it. I'm sorry.

"A. Well, it just moved to the side real fast. Just all of a sudden. I wasn't expecting nothing to happen. And it just jerked to the right and threw me off. I don't know how to explain it. It was just a sudden movement, * * *

"Q. * * * this movement that you described as a sudden movement or jerk, did this happen to you the first time you went up this ladder on this night?

"A. No sir. Just went up and down it without any trouble.

"Q. Did you have anything in your hands?

"A. No sir.

"Q. What were the position of your feet right before you fell, if you can remember?

"A. I had one on the second rung—the first one is even with the platform—like this is the platform here, well, ladder going down, the first rung of the ladder is even with it, and then the second one. Well, I had my right foot on top of the platform, my left foot was on the first rung as I started down.

* * * * * *

"Q. Let me put it this way, Mr. Freitas: After you fell did you get up and go up the ladder and inspect it or look at it to ascertain what had happened to it?

"A. No, sir, I didn't. I wasn't able.

* * * * * *

"Q. Well, it's a fair statement then that your testimony is that it had never been unsteady at all with you prior to the time that you started back down it and you say it lurched?

"A. Yes sir."

Mr. T. B. Mock, Secretary and Treasurer and former chairman of the board and

Vice-President of Twin City, testified in part:

"Q. But in any event certainly if you got a ladder up a tank you will agree with me, will you not, sir, that to have that ladder solidly anchored to the ground makes in a general way for a much safer deal, doesn't it?

"A. Yes sir.

"Q. And it's good safety practice to anchor the foot of a ladder, isn't it?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. And from the time it was put up there until the present time it has continued using it and operating it just like you did when you first started?

"A. Yes sir.

"Q. Without any change?

"A. Yes sir."

Everett Sagnes, the manager of Twin City testified in part:

"Q. \* \* \* Now talking about now, at this time, I belive you said that there was a steel ladder over here, or metal ladder, on this last tank. The number 3 tank?

"A. Yes.

"Q. Is that attached or fixed permanently in any manner to that tank?

"A. What do you mean, welded or—

"Q. Yes, fixed permanently.

"A. It is not welded, it's chained onto the tank.

"Q. All right. Up at the top it has a chain which chains the top of the ladder to the tank?

"A. Yes sir.

"Q. It's not fixed in any manner at the bottom is it?

"A. At the bottom, yes, it's fixed into—it's got bolts in the concrete.

"Q. At the bottom of the tank?

"A. Yes.

\* \* \* \* \* \*

"Q. All right. But on that ladder it's definitely anchored down here at the bottom of the ladder isn't it?

"A. Yes.

\* \* \* \* \* \*

"Q. All right. And really what the situation was with that ladder, the wooden ladder, at the time you all asphalted or tarred out there two years ago, that other than the fact that it might be resting upon the ground or might be to some extent in the ground, about which you don't know, it was otherwise loose, wasn't it?

"A. Yes.

\* \* \* \* \* \*

"Q. Now that ladder on the one that the arrow points to, that is owned outright by Twin City, that has a metal or an iron ladder on it, doesn't it?

"A. Yes sir.

"Q. And at the top the ladder is attached by a chain, isn't it?

"A. Yes sir, the chain is hooked on the ladder and the chain is wrapped around a fill pipe at the top.

"Q. Now at the bottom of that ladder there is a poured cement little platform and the bottom of that ladder is bolted to it, isn't it?

"A. Yes sir."

Joe Watson, representative of Gulf Oil Corporation testified in part:

"Q. My question, sir, was the ladder bonded to the metal in any way? The wooden ladder?

"A. Well, no, not that I know of.

"Q. Well, now, was it entrenched or anchored in the ground in any way on December 15, 1962?

"A. I don't know.

"Q. From your investigation and interrogation about the matter, sir, was it entrenched or embedded in the ground in any way in December of 1962?

"A. Not that I can swear to, no."

As above stated, we are of the view that looking at the evidence tendered under all the surrounding facts and circumstances, and under the Rules heretofore stated, that the inferences and intendments reasonably deducible thereform was sufficient to raise the jury issue of negligence, proximate cause and damages to the plaintiff. It follows that it was error for the Court to withdraw the case from the jury and instruct a verdict for appellees and enter judgment thereon for appellees, and that this will require a reversal and remand of the cause. It follows that if we are correct in our views heretofore expressed, the court erred in rendering judgment that the Aetna Casualty and Surety Company recover nothing. We are also of the further view that the court erred in sustaining appellees exceptions to and striking appellants' pleadings to the effect that each appellee negligently failed to warn appellant that the ladder and platform was unattached and incapable of supporting him. We are of the further view that the court erred in further excluding evidence of Mr. Mock to the effect that in securing the ladder to the tank and the ground that it would prevent it from moving and make it safer.

Points 6, 7 and 8 are sustained.

Point 9 is overruled.

For reasons stated, this cause is reversed and remanded.

WILSON, J., concurs in the result.