EXXON CORPORATION and Offshore
Casing Crews, Inc., Appellants,

v.

Lynda ROBERTS, et al, Appellees.

No. 9496.

Court of Appeals of Texas,
Texarkana.

Dec. 30, 1986.

Rehearing Denied Feb. 18, 1987.

Rene J. Mouledoux, Exxon Company, U.S.A., Houston, for Exxon.

T. John Ward, Sharp, Ward, Price, Hightower & Searcy, Longview, for Offshore.

Paul L. Sadler, Wellborn, Houston, Adkinson, Mann & Sadler, Henderson, for appellees.

CORNELIUS, Chief Justice.

David Roberts was killed in an oil field accident in Upshur County. His widow and daughter sued Exxon, the owner of the well, and Offshore Casing Crews, the casing contractor, alleging that the accident was due to their negligence. The jury found both Exxon and Offshore negligent and apportioned seventy-five percent of the

fault to Exxon and the remainder to Offshore.

Exxon cross-claimed against Offshore for indemnity under contractual indemnity and breach of contract theories. These claims were submitted to the trial court along with a claim by Offshore for contribution. The court granted Exxon's claims for breach of contract and indemnity, and denied Offshore's claim for contribution. Exxon appeals the judgment in favor of the Robertses, and Offshore appeals the judgment for Exxon.

## EXXON'S APPEAL

Exxon challenges the sufficiency of the evidence and asserts error in the submission of jury issues, the admission of certain evidence, and because of an alleged irreconcilable conflict between two of the special issues. We overrule these points of error, and affirm the judgment in favor of the Robertses against Exxon.

David Roberts was employed by Rainbow Drilling Company. Exxon engaged Rainbow as the drilling contractor to drill a well on an Exxon lease in Upshur County. Exxon engaged Offshore as the casing contractor to install the casing. On May 29, 1983, the Rainbow crew finished drilling a portion of the well and began to circulate mud through the drill pipe to flush the clippings out of the hole. This process clears the hole so that surface casing can be placed in the well. Exxon's representative at the well site was Buddy Fiew. Fiew observed the circulation process and told the Rainbow toolpusher to move the casing tools, which had been placed on the ground near the well platform, up to the rig floor.

Casing tools are large, heavy pieces of equipment used to lift and place casing pipe into the well. They are about three feet by three feet square, and weigh nearly 4,000 pounds. The tools were raised to the rig floor by the boom-line method. That method involves hoisting the tools into the air with a cable lowered from the derrick's boom. A snub line is attached to the tool and is held by workers on the ground in order to control the tool's movement and to keep it away from the rig structure as it is raised. The boom-line method requires the crew on the platform floor to operate the hoist and direct the operation, and the crew on the ground to gradually let out the snub line as the tool is raised. The hoist operator cannot see the ground crew, because he is positioned away from the railing of the rig floor in order to operate the hoist controls. A flagman is therefore placed near the rail so he can relay signals between the ground crew and the hoist operator.

On this occasion the Rainbow crew operated the hoist, and the Offshore crew held the snub line. David Roberts was the flagman. As the tool came over the platform railing, the snub line was released causing the tool to swing out of control and strike Roberts twice in the chest. He later died from his injuries.

One who entrusts work to an independent contractor, but who retains control of some part of the work, may be liable to others for damages caused by his failure to exercise reasonable care in his control of that work. *Redinger v. Living, Inc.,* 689 S.W.2d 415 (Tex.1985); Restatement (Second) of Torts § 414 (1965). The jury found that Exxon exercised control over the lifting procedure and that finding is not challenged on this appeal. The jury further found that Exxon's control was negligent in four specific areas and that each of those acts or omissions was a proximate cause of Roberts' death. Exxon attacks these findings as being supported by no evidence or insufficient evidence.

The first finding of negligence was Exxon's failure to use a cat-line procedure to raise the casing tools rather than a boom-line procedure. The cat-line procedure involves dragging the tools up a ramp onto the platform floor. It avoids the need of hoisting the tools into the air, and thus eliminates any need for a snub line. The thrust of Exxon's argument is that use of the boom-line procedure could not have been negligence or a proximate cause of the accident because it was a standard, safe procedure which could not reasonably be foreseen as a danger.

Negligence is the failure to act as a reasonably prudent person would under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to persons situated as the plaintiff. *Bennett v. Span Industries, Inc.*, 628 S.W.2d 470 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.). Proximate cause requires reasonable foreseeability and cause in fact. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901 (Tex.1980). An event is reasonably foreseeable if a person of ordinary intelligence should have anticipated dangers that his negligent act created for others. *Nixon v. Mr. Property Management*, 690 S.W.2d 546 (Tex.1985). Cause in fact embraces the cause which produces an event and without which the event would not have occurred. *Nixon v. Mr. Property Management*, supra.

Evidence supporting the jury's findings on the boom-line procedure came from testimony by Exxon's representative, Buddy Fiew. Fiew ordered the tools raised to the rig floor. He could have required the cat-line procedure but did not do so, although he was aware of the possible dangers involved in using the boom-line procedure and admitted that the cat-line method was the safer method of putting tools on the platform. Exxon supported its position by evidence that the boom-line procedure is considered routine and standard procedure in the industry and that no problems with it had ever been encountered by either crew. Nonetheless, Fiew conceded that the lifting procedure could have been safely performed by using the cat-line method and that it would have avoided the dangers inherent in the boom-line procedure. This fact, considered along with the difficulty of communication between Offshore's Spanish-speaking crew and Rainbow's English-speaking crew, and the failure to have a safety meeting to explain and coordinate the operation, constitutes sufficient evidence to support the jury's findings of negligence and proximate cause in Exxon's failure to use the cat-line method.

The jury also found that Exxon was negligent in failing to require that Offshore's crew be able to adequately speak and understand English. It is undisputed that Offshore's crew was Spanish speaking, although the foreman of the crew, Jesus Charles, and one other crew member spoke some English. Charles' English was limited, however, as indicated by his deposition testimony which was taken with the use of an English interpreter.

Proper communication between the crews was essential for them to understand and coordinate their actions. It was Exxon's responsibility to coordinate the two crews' actions, but Exxon's representative, Mr. Fiew, did not know if the two crews could communicate and did nothing to ensure that they could. In fact, he admitted that Charles spoke only some English and did not know if the remainder of the Offshore crew spoke any English. In spite of this, he ordered the tools raised to the platform floor knowing the boom-line method required the use of both crews and that a lack of communication between the crews could cause an accident.

The accident occurred because someone let go of the snub line at the wrong time. Jesus Charles testified that he let go of the snub line when the tool moved above the rig floor railing. He thought someone told him to let go of the rope, but did not know exactly what was said. Exxon urges that the failure to have an English-speaking crew could not have been a proximate cause of the accident, because the rig noise level required that all communications be nonverbal. Charles, however, testified that it was a verbal signal which caused him to release the rope. There was evidence that Fiew knew the dangers which could occur between crews that could not communicate, and that improper communication caused the line to be released prematurely. We find the evidence sufficient to support the jury's findings on this issue.

In Special Issues 6 and 7 the jury found that Exxon's failure to hold a safety meeting and their failure to have a rule requiring such a meeting constituted negligence and proximate cause.

There was evidence that Fiew could have called a safety meeting had he wanted to. He had the authority and the responsibility

to do so if one was to be called. He knew that such a meeting could have been used to explain the operation and coordinate the actions of the two crews and that a safety meeting could have prevented the accident.

Exxon contends that foreseeability is absent in the safety meeting issue because the Offshore and Rainbow crews had performed the boom-line lift operation on numerous occasions without incident. There is evidence, however, that the members of these particular crews had not worked together in the past and were not familiar with one another.

■ Concerning the issue involving the safety rule, Fiew stated that such rules are aimed at preventing accidents and deaths and are good rules. He believed a meeting could have prevented the accident. It should go without saying that if safety meetings are necessary to coordinate activities and explain procedures to avoid accidents, and they are not routinely held on a voluntary basis, the absence of a rule requiring such meetings could be negligence and proximate cause in a case of this type.

After an examination of each issue and the underlying evidence, we cannot say that the issues were supported by no evidence or that the jury's answers were against the great weight and preponderance of the evidence. Submission of the issues was therefore proper, as was the trial court's denial of Exxon's motion for judgment notwithstanding the verdict and its motion for new trial.

■ Exxon next attacks the damage awards as excessive and as against the great weight of the evidence. The burden of establishing that damages are excessive is upon the complaining party, *Costa v. Storm,* 682 S.W.2d 599 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), and the standard for determining excessiveness is the factual insufficiency of the evidence supporting such damages. *Pope v. Moore,* 29 Tex.Sup.Ct.J. 412 (June 11, 1986).

■ The jury found damages as follows:

Lynda Roberts (wife):

| | | |
|---|---|---|
| (a) | Past pecuniary loss | $ 37,000.00 |
| | Future pecuniary loss | 500,000.00 |
| (b) | Past lost companionship | 100,000.00 |
| | Future lost companionship | 100,000.00 |
| (c) | Past mental anguish | 150,000.00 |
| | Future mental anguish | 50,000.00 |

Traci Roberts (daughter):

| | | |
|---|---|---|
| (a) | Past pecuniary loss | 12,000.00 |
| | Future pecuniary loss | 165,000.00 |
| (b) | Past lost companionship | 10,000.00 |
| | Future lost companionship | 90,000.00 |

David Roberts was twenty-three years of age when he died, and he had a life expectancy of 46.5 years and an annual income of approximately $20,000.00. Dr. Tim Kane, a professor of economics, testified to pecuniary loss. He estimated the family's loss of future earnings as $719,192.00 after deduction for David's estimated consumption. He then allocated $584,537.00 to Lynda and $87,345.00 to Traci. The jury found total pecuniary losses of $665,000.00, but allocated to the child almost double what Kane allocated to her. The jury was not bound by Kane's opinion of the proper allocation, and since the total damages found did not exceed the future pecuniary loss established by the evidence, the finding is supported by evidence and is not excessive.

■ Exxon also questions the awards of companionship and mental anguish. Awards for mental anguish and companionship are largely in the discretion of the jury. *Robertson v. Rig-A-Lite Company,* 394 S.W.2d 838 (Tex.Civ.App.—Houston 1965, writ dism'd). The awards for companionship and mental anguish are supported by the testimony of Mrs. Roberts and her psychologist, Dr. Craig Moore, and are not against the great weight and preponderance of the evidence. Mrs. Roberts watched her husband and ministered to him for several weeks as he was in intense pain as he was dying from his injuries.

Exxon further argues that the submission of Special Issue No. 7 was error because it was not supported by the pleadings. The issue inquired whether Exxon should have had a rule which required safety meetings.

■ Tex.R.Civ.P. 47 requires that pleadings give fair notice of the claim involved. Fair notice is given if an opposing attorney of reasonable competence with the

pleadings before him can ascertain the nature and basic issues of the controversy and the testimony probably relevant to those issues. *Roark v. Allen*, 633 S.W.2d 804 (Tex.1982); *Davis v. Quality Pest Control*, 641 S.W.2d 324 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.); 2 R. McDonald, *Texas Civil Practice in District and County Courts* § 5.05 (rev. 1982).

 The third amended petition contains two paragraphs alleging negligence. In relevant part they alleged:

> [T]he defendants were negligent on the occasion in question, and that they violated the duty to exercise ordinary care, which they owed David Roberts *in their supervision* of the job, *the procedure which was followed*, and the performance of their respective tasks. (Emphasis added.)

Although these allegations do not specifically allege negligence in failing to have a safety rule, they go beyond a mere assertion of general negligence and include averments of improper supervision and procedure, and therefore appear adequate to meet the fair notice test.

 Exxon also contends that the trial court erred in allowing evidence that, as a result of the accident, Exxon stopped using the boom-line method and began using the cat-line method for moving casing tools, and also began calling safety meetings before crews would begin casing operations.

Tex.R.Evid. 407 prohibits the use of subsequent remedial measures to prove negligence, but that kind of evidence may be used to prove ownership, control or feasibility of precautionary measures if those issues are controverted. In answers to interrogatories Exxon stated that Rainbow was responsible for the drilling of the well and for making decisions concerning the daily operations of the well. Exxon's position that it was not in control of the tool lifting procedure was also made clear at other stages of the trial and when it examined the jury panel members on voir dire. As the issue of control was disputed, evidence of the remedial measures was properly admitted. Exxon could have requested, pursuant to Tex.R.Evid. 105(a), an instruction to the jury limiting consideration of the evidence to the relevant issues, but did not do so.

Tex.R.Evid. 403 requires that evidence be excluded if its prejudicial effect outweighs its probative value. Generally, in order for the admission of evidence to constitute reversible error the reviewing court must conclude that error occurred, and that it was harmful and was calculated to cause and probably did cause the rendition of an improper judgment. *Howard v. Faberge, Inc.*, 679 S.W.2d 644 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); Tex.R. App.P. 81. Of course the evidence of subsequent remedial procedures was prejudicial to Exxon, but we cannot say from the entire record that its introduction was error. The evidence was probative of control and of the feasibility of precautionary measures, both of which were challenged by Exxon. In these circumstances the trial court's action was proper.

 Exxon also contends there is a fatal conflict between Special Issues 2 and 5. In Issue 2 the jury found that Offshore furnished a crew that could not adequately speak English, but that such action was not negligence. In Issue 5 the jury found that Exxon failed to require that Offshore furnish an English-speaking crew and that such failure was negligence and proximate cause.

We may not strike down jury answers on the ground of an irreconcilable conflict if there is any reasonable basis upon which they can be reconciled. *Little Rock Furniture Manufacturing Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985 (1949). We must reconcile conflicts in the findings if reasonably possible in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole. *Bender v. Southern Pacific Transportation Co.*, 600 S.W.2d 257 (Tex.1980); *Ford v. Carpenter*, 147 Tex. 447, 216 S.W.2d 558 (1949).

The jury found that Exxon controlled the premises and had the responsibility to oversee the drilling operation and coordinate the activities of the two crews. A conclu-

sion that Exxon was negligent in failing to require an English-speaking crew can follow from that responsibility. Offshore, on the other hand, had no supervising duty. Their responsibility was to furnish a crew which was able to install the casing. They fulfilled that responsibility. It then became Exxon's duty to ensure that the two crews could safely work together. The jury apparently recognized Exxon's duty and Offshore's corresponding lack of duty. Viewed in this light the findings are not irreconcilably conflicting.

### OFFSHORE'S APPEAL

█ Offshore argues that the trial court erred in granting Exxon contractual indemnity, because Exxon was negligent and because their contract indemnified Exxon for Offshore's negligence only. We agree.

The contract between Offshore and Exxon provided in relevant part, the following:

Contractor [Offshore] agrees to begin and to press with due diligence until completion in accordance with plans and specifications agreed to by Contractor and EXXON and in a good and workmanlike manner with the necessary crews, tools, machinery and equipment furnished and maintained by Contractor at its own cost and expense....

....

It is understood and agreed that all work so done by Contractor [Offshore] shall meet with the approval of EXXON'S representatives but that the detailed manner and method of doing the work shall be under the control of Contractor, EXXON being interested only in the result obtained, and that Contractor is an independent contractor as to all work performed hereunder. ... Contractor further agrees to protect, indemnify and save EXXON harmless from and against all claims, demands and causes of action of every kind and character arising in favor of Contractor's employees, EXXON'S employees or third parties on account of personal injuries, death or damages to property in any way *resulting from the willful or negligent*

*acts or omissions of Contractor, Contractor's agents, employees, representatives or sub-contractors.* (Emphasis added.)

For the contract to indemnify Exxon against its own negligence it must express such an intent in clear and unequivocal terms. *Eastman Kodak Co. v. Exxon Corp.*, 603 S.W.2d 208 (Tex.1980); *Delta Engineering Corp. v. Warren Petroleum*, 668 S.W.2d 770 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Not only does the contract here fail to clearly express such an intent, it clearly expresses a contrary intent, i.e., that Offshore agrees to indemnify Exxon against losses due only to the negligence or wrongful acts of Offshore or its agents, employees or subcontractors.

█ Exxon argues that Offshore waived the defense of Exxon's negligence by not pleading it. We disagree. This cause originated as a negligence action against Exxon and Offshore. Exxon's negligence was pleaded, jury issues were submitted, and the jury answered those issues against Exxon. Although an indemnitee's negligence is an affirmative defense to an indemnity action, a special pleading of that negligence is not necessary in a multi-party suit where the indemnitee's negligence is pleaded and proved, and that indemnitee then cross-claims against a party indemnitor for contractual indemnity. *See Delta Engineering Corp. v. Warren Petroleum*, supra.

█ Offshore also complains of the court's awarding indemnity to Exxon on the basis that Offshore breached a provision of its contract requiring it to perform its work in a good and workmanlike manner. The trial court based its holding upon Offshore's negligence in prematurely releasing the snub line.

█ Generally, a warranty of workmanlike performance refers to the quality of the work, not to negligent acts which do not concern quality but which may cause injury to others. *Transworld Drilling v. Levingston Shipbuilding*, 693 S.W.2d 19 (Tex.App.—Beaumont 1985, no writ). The

court in *Transworld* held that the owner of an offshore drilling rig did not breach a similar warranty of workmanlike construction because such a warranty referred to the quality of the work, not to an incident of negligence in which a crane serviceman was injured when a large piece of machinery was being lowered into place on the rig. We believe *Transworld* correctly states the law. To hold otherwise would effectively allow a covenant to perform in a good and workmanlike manner to be transformed into a contract of indemnity for negligent injuries to third parties. At any rate, even if the negligent act of Offshore constituted a breach of the covenant of good and workmanlike performance, Offshore would be liable only for its twenty-five percent portion of the damages resulting therefrom, as apportioned by the jury, not the seventy-five percent caused by Exxon's negligence, as allowed by the trial court.

Tex.Civ.Prac. & Rem.Code Ann. § 33.012 (Vernon 1986) provides for contribution in proportion to the percentage of negligence of each defendant. Consequently, that portion of the judgment below granting full indemnity to Exxon is reversed, and judgment is here rendered denying Exxon indemnity and assessing the damages seventy-five percent to Exxon and twenty-five percent to Offshore. In other respects the judgment below is affirmed.

Reversed and rendered in part; affirmed in part.

## ON MOTION FOR REHEARING

CORNELIUS, Chief Justice.

In its motion for rehearing Exxon complains that we did not directly address their points challenging the jury's apportionment of fault. Exxon contends that the apportionment of fault seventy-five percent to it and twenty-five percent to Offshore is not supported by the evidence or is against the great weight and preponderance of the evidence.

Considering the facts that Exxon chose the method of raising the casing tools, it was in complete control of the operation, and the procedure used contributed to a lack of effective communication which produced Offshore's premature release of the snub line, we conclude there is sufficient evidence to support the jury's apportionment and that its finding is not against the great weight and preponderance of the evidence.